(78 South. 933)

No. 22979.

STATE v. ROBINSON et al.

(April 29, 1918.    Rehearing Denied May 27, 1918.)

*(Syllabus by Editorial Staff.)*

1. HOMICIDE ⊜285—INDICTMENT—INSTRUCTION.

Since it is not essential that an indictment for murder contain the word "willful" or "willfully," the charge defining the offense need not contain the word.

2. HOMICIDE ⊜8—MURDER.

The crime of murder under Louisiana law is exactly and precisely the same as at common law.

3. INDICTMENT AND INFORMATION ⊜110(2)— INDICTMENT—COMMON LAW AND STATUTE.

Though the common-law form of indictment for murder is good under Louisiana law, if the short form of indictment, provided by Rev. St. § 1048, is used, it must be strictly adhered to, and the word "willfully" employed.

4. HOMICIDE ⊜285—MURDER—SHORT FORM OF INDICTMENT—INSTRUCTION—STATUTE.

If Rev. St. § 1048, prescribing the short form of indictment for murder, prohibits the use of the common-law form of indictment, and makes imperative the use of the short form, only the indictment is thereby regulated, and not the court's charge describing the offense, which need not contain the word "willfully," as the short form of indictment must.

5. HOMICIDE ⊜7—"MURDER."

"Murder," as defined at common law, is where a person of sound mind and discretion unlawfully kills any human being in the peace of the sovereign, with malice aforethought, either express or implied.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Murder.]

6. CRIMINAL LAW ⊜1091(10)—APPEAL—BILL OF EXCEPTIONS.

Defendant's bill of exceptions to the charge defining murder, which did not show that the trial judge was informed when the exception was taken in what respect his definition was held to be defective, was itself defective.

7. HOMICIDE ⊜285—INSTRUCTION—DEFINITION OF MURDER.

The judge trying a prosecution for murder is not required by any law to include a definition of murder in his charge, whether framed by himself or by somebody else.

8. HOMICIDE ⊜285—INSTRUCTIONS.

In a prosecution for murder the trial judge in charging is not compelled by any statute or rule at common law to use any particular words or set of words in fulfilling his duty of giving the jury a knowledge of the law of murder.

9. CRIMINAL LAW ⊜9 → COMMON-LAW CRIMES.

No common-law crimes exist in Louisiana, nothing being a crime which is not so by statute.

10. HOMICIDE ⊜127, 285—INDICTMENT AND CHARGE—STATUTE.

Despite Rev. St. § 784, providing that whoever shall commit the crime of willful murder on conviction thereof shall suffer death, an indictment for murder, and the court's charge defining the offense, need not use the word "willful" or "willfully."

11. HOMICIDE ⊜31 — INVOLUNTARY MANSLAUGHTER.

No such crime as involuntary manslaughter is known to the Louisiana law, though at com-

mon law there was such a crime, punishable differently from voluntary manslaughter.

**12. HOMICIDE ⟨key⟩21—DEGREES OF MURDER.**

In Louisiana there are no degrees of murder, but, as at common law, only plain murder.

**13. HOMICIDE ⟨key⟩309(2)—INSTRUCTIONS—INVOLUNTARY MANSLAUGHTER.**

In a prosecution for murder, the judge is not required to charge as to involuntary manslaughter, a crime unknown to Louisiana law, since he is required only to "give to the jury a knowledge of the law."

**14. HOMICIDE ⟨key⟩129—INDICTMENT FOR MURDER — "MALICIOUSLY" — "MALICE AFORETHOUGHT."**

The word "aforethought," qualifying "malice," is so technical that it cannot be left out of an indictment for murder, and "maliciously" and "malice aforethought" do not mean the same thing, malice comprehending ill will, wickedness of disposition, cruelty, recklessness, and a mind regardless of social duty, while "malice aforethought" or "premeditated design" includes in addition premeditated malice.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Malice Aforethought; Malice.]

**15. HOMICIDE ⟨key⟩286(3) — MURDER—INSTRUCTIONS.**

In a prosecution for murder, the court improperly charged that the word "aforethought," used in connection with the word "malice" in the definition of murder, adds little, if any, to the meaning of the word "malice" standing alone.

**16. HOMICIDE ⟨key⟩309(6)—MURDER — INSTRUCTION.**

In a prosecution for murder, where deceased was not fighting with his fists, and accused did not know deceased was unarmed, the court's charge that, where only one of the parties enters the fight armed with a dangerous weapon, with felonious intent to make use of it, and does so against his unarmed antagonist, who is fighting with his fists, and kills him, the slayer is not to be heard to say the killing was manslaughter as done in sudden heat of passion was erroneous, as abstract, stating hypothetical facts not fitting the case, etc.

**17. HOMICIDE ⟨key⟩300(13)—MURDER—INSTRUCTIONS.**

In a prosecution for murder, where neither party struck the other, and there was evidence that deceased had thrown his hand behind him, and that, on his doing so, accused had fired the fatal shot, the instruction that to call a man a son of a bitch, and to inflict upon him a violent blow in the face with the fist, would be adequate cause of provocation to the person so insulted and assaulted to reduce his killing of the assaulting party to manslaughter was erroneous, as calculated to create the impression that accused must have been violently assaulted in order to be in a position to plead self-defense.

143 LA.—18

**18. HOMICIDE ⟨key⟩110—SELF-DEFENSE—FELONIOUS ASSAULT.**

To justify a killing as in self-defense, the overt act on the part of the deceased person need not have amounted to a felonious assault; the test being, not what the person assaulting, or apparently assaulting, intended, but what the act he did, taken in consideration with the facts, caused defendant to believe was his intention.

Monroe, C. J., and Leche, J., dissenting in part.

Appeal from Tenth Judicial District Court, Parish of Concordia; N. M. Calhoun, Judge.

Indictment of Grover Robinson and John Robinson for murder. From conviction appeal is taken. Judgment and verdict set aside, and case remanded, to be proceeded with according to law.

Dale, Young & Dale, of St. Joseph, and Stone Deavours and B. W. Sharborough, both of Laurel, Miss., for appellants. A. V. Coco, Atty. Gen., and Jos. M. Reeves, Dist. Atty., of Vidalia (R. D. Calhoun and Hugh Tullis, both of Vidalia, and Vernon A. Coco, of New Orleans, of counsel), for the State.

PROVOSTY, J. The accused was convicted of murder, without capital punishment, and has appealed.

[1, 2] His first complaint is of the definition of murder contained in the judge's charge to the jury, which is the one found in the common law books. He contends that this definition is not sufficient under our law because it does not contain the word "willful" or "willfully." His learned counsel argue that, this word, being essential, or sacramental, in the description of the crime in the indictment, is logically so in the judge's charge to the jury. If this crime cannot possibly, they argue, be described adequately by the grand jury to the court in the indictment without the use of this word, how can it possibly be described adequately by the judge to the jury in his charge without the use of this same word.

The answer is that the crime can be ade-

quately described by the grand jury to the court in the indictment without the use of this word. This word was not sacramental in the indictment at common law, and the crime of murder under our law is exactly and precisely the same as at common law. As to this word not having been essential or sacramental in the indictment at common law, see State v. Harris, 27 La. Ann. 572, Bishop, New Crim. Pro. vol. 2, p. 234, par. 546, where the author says:

"This word willfully, alike in reason and on such authorities as we have, is not important."

See 1 Chitty, Crim. L. par. 242, where, in stating the terms which are "absolutely necessary" in an indictment for murder, the author mentions "feloniously" and "of his malice aforethought," but makes no mention of willfully. See Bouvier Law Dict., where these same words are said to be indispensable in an indictment for murder, citing long lists of authorities; and where no mention at all is made of the word "willful" or "willfully," as if having no technical, or special, legal meaning, and therefore not entitled to a place in a law dictionary. We might multiply proofs, but these ought to suffice.

As to murder being the same under our law as at common law, see State v. Mullen, 14 La. Ann. 570. That decision has been acquiesced in by bench and bar for now more than 60 years, and in fact we do not understand counsel as questioning its soundness even in this case. The court there said:

"The second section of the act of 1855, p. 130 [now § 785, Rev. Stat.] which declares that there shall be no crime known under the name of murder in the second degree, and authorizes the jury to find the prisoner guilty of manslaughter, does not confine the crime of murder to cases where the homicide is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, as was provided by the act of July 3, 1805, but leaves the definition of the offense as defined and known under the common law of England. The first section of the act of 1855 is almost a literal re-enactment of the third section of the act of 23d of January, 1805. It provides, that whoever shall commit the crime of willful murder, on conviction thereof, shall suffer death.  *  *  *

"By the act of 1805, still in force, it is provided that all crimes, offenses and misdemeanors shall be taken, intended, and construed, according to and in conformity with the common law of England. To ascertain, then, what constitutes the crime of willful murder, we must have recourse to the writers of the common law. The district judge did not, therefore, err in refusing to charge the jury, that the word 'willful' was used in the statute in the sense of 'premeditated,' and that the Legislature intended to modify the crime as known at common law."

[3] Murder being the same under our law as at common law, there could be no reason why an indictment which would have adequately charged the crime at common law should not be sufficient under our law. A form of indictment that has stood the acid test at common law should stand it under our law; the crime being exactly the same under the two systems. This court has never held differently. What it has held is that the short form of indictment for murder which is provided for in section 1048, Rev. Stat., must be strictly adhered to, if used. Not that it must be used, but that if used it must be strictly adhered to; that the word "willfully" contained in it cannot be left out. But the reason assigned for this is not that this word was essential at common law either in the definition of the crime or in the indictment; but that it is essential in this statutory form of indictment because the statute has made it so. State v. Williams, 37 La. Ann. 777. As was said in State v. Green, 36 La. Ann. 99:

"This court cannot accept as sufficient less than what the law prescribes should be sufficient."

The "law" which the court here refers to is the said section 1048, Rev. Stat., providing the said short form of indictment. This section reads:

"Sec. 1048. In every indictment for murder it shall not be necessary to set forth the manner in which or the means by which the death

of the deceased was caused, it shall be sufficient in every indictment for murder to charge that the defendant did feloniously, willfully and of his malice aforethought kill and murder the deceased; and it shall be sufficient in every indictment for manslaughter to charge that the defendant did feloniously kill and slay the deceased."

The language of this statute, "It shall be sufficient," etc., cannot be construed into a prohibition to use the common-law form of indictment. The terms are permissive, not inhibitive. And it will be observed that, while there was reason to allow a short and simpler form to be used for convenience, and to do away with the technicalities of the common-law form of indictment, which were so many pitfalls in the path of the prosecution, there was no reason why the common-law form should be absolutely prohibited.

[4] But let us grant that said statute amounts to a prohibition, that only this short statutory form can be used, and that every word and letter of it is sacramental, what then? Would it follow that the same sacramentality attaches to the words to be used in the definition? If, so, why?

It is said that what must be alleged must be proved. True, but what is meant by this is that the facts alleged must be proved; not the words by means of which the facts are alleged. The words are not alleged; they are merely used for alleging the facts. And if they were alleged, they could not be proved. How could words be proved? Only as the result of a confusion of thought, therefore, can it be said that the word willful, or willfully has to be alleged and proved.

The argument that since the crime of murder cannot possibly be adequately described by the grand jury to the court in the indictment without the use of the word willful, it necessarily cannot be adequately described or defined to the jury by the judge without the use of this same word, is in like manner based upon a confusion of thought. The office, service, or function of the indictment is not the same as that of the judge's charge. The two play an entirely different part in the trial of the case. The function of the indictment is to convey to the court information as to certain facts, those constituting the crime. The function of the judge's charge is to explain to the jury the nature of the crime with which the accused is charged. The two being thus entirely different, in fact, having no connection or anything whatever to do with each other, a statute which in express terms refers to the one only cannot, except by a confusion of thought, be extended to the other. Only by a confusion of thought can it be said that by regulating the one the statute necessarily regulates the other. So that, if it be conceded, as for argument we are here doing, that the said section 1048, Rev. Stat., absolutely prohibits the use of the common-law form of indictment for murder, and makes imperative the use of the short form which it provides and declares shall be sufficient, the legal situation is simply that the indictment is thereby regulated, and not that the judge's charge is regulated.

[5] The absence of any and all necessity that the definition of a crime be in the words of the indictment is well illustrated by the circumstance that at common law, while the word "felonious" was essential or sacramental in the indictment (see authorities hereinabove cited), it was not found to be necessary in the definition of the crime, the following being the commonly accepted definition:

"Murder, as defined at common law, is where a person of sound mind and discretion unlawfully kills any human being, in the peace of the sovereign, with malice aforethought either express or implied." 21 Cyc. 703; Wharton, Crim. L. (7th Ed.) par. 930; (11th Ed.) par. 418.

Granting, then, for argument, that the use of this short statutory form of indictment is imperative, a thing, we repeat, which this court has never held, and which the mere

permissive terms of the statute would not seem to indicate, and that the word "willfully" therein found is sacramental, as it has been held to be, the reason why this word has been held to be sacramental in this indictment when this statutory form is used is totally inapplicable to the judge's charge to the jury; and when the reason for a conclusion ceases, the conclusion also ceases. That reason, as stated in the several cases hereinabove referred to, is that the words of this statutory form are sacramental because the statute has made them so, a reason that has no application to the judge's charge; for neither said section 1048, Rev. Stat., nor any other law has prescribed the words which the judge may, or shall, use in the task which the law has laid upon him of imparting to the jury the legal notion of the crime charged in the indictment. The only statute applicable to the charge is section 991, Rev. Stat., reading:

"In charging the jury * * * the judge must limit himself to giving them a knowledge of the law applicable to the case."

Nothing is said here of the judge's having to use any particular terms or words, sacramental or other, in thus "giving to the jury a knowledge of the law."

We will mention here that the complaint of the accused is not that the judge did not "give to the jury a knowledge of the law," for he did, barring certain errors hereinafter to be noticed; but that it is, specifically, in the language of the bill of exceptions, that:

"The defendant excepted to the definition of murder given by the court in its charge to the jury, and the court not changing its ruling in said respect, defendant excepted," etc.

The bill does not state in what respect the definition was defective; but we were informed in the oral argument, and the information is again conveyed in the brief, that the ground of complaint was the absence of the word willful from the definition.

[6, 7] We might have ignored this bill of exception as being defective in not showing that the trial judge was informed at the time the exception was taken in what respect his definition was held to be defective (State v. Weston, 107 La. 45, 31 South. 383; 21 Cyc. 852), and we might also have ignored it as presenting merely a moot question, since no law requires a judge to include a definition of murder in his charge, either framed by himself or framed by somebody else; but, inasmuch as the case will have to be tried again, we have thought it advisable to pass upon this bill as if it referred, not solely to the definition attempted by the judge, but to the charge as a whole, as not containing the word willful, or willfully; and this we do in order that the case may not come here again in the event of a second conviction.

Bishop, the most analytical of our writers on criminal law, criticizes the definition of murder given by Hawkins, and in a note reproduces those framed by Coke & Mansfield, and then ventures upon one of his own, and winds up by saying that a definition "in all respects neat, complete, and exact is in the nature of the subject impossible." Bishop, New Crim. Law, vol. 2, pars. 732–735. The framing of such a definition is by no means necessary in a charge, or even in a treatise. Witness Ruling Case Law, McClain on Crim. L., and others. Bishop's attempt at definition, ubi supra, is more in the nature of an explanation; and that is, perhaps, what a judge, in charging a jury, had better confine himself to. But if he does give a definition, his safe course is, no doubt, to do what the learned trial judge did in this case, adopt one that has stood the test of the courts.

[8] Coming back to our discussion, and dealing with the question as if the bill had been reserved to the absence of the word "willful" from the charge, we say that no statute and no rule at common law compels a judge to use any particular words or set of words in fulfilling his duty of "giving to

the jury a knowledge of the law" of murder; that he may use his own words, if they can stand the test of having "given to the jury a knowledge of the law" of murder. State v. Williams, 34 La. Ann. 959. It may be a risky venture for him to undertake to do so, and very much safer for him to follow the beaten path traced in the books; but no law compels him. And the sole question that can arise is as to whether he has "given to the jury a knowledge of the law" bearing upon the crime in question.

In the present case, the learned trial judge told the jury that homicide is either "felonious or not felonious"; that "murder is the unlawful and felonious killing with malice aforethought," etc. He defined or explained malice as is done in the books, and said of the word "aforethought" that it "signifies deliberation, design, or premeditation." Of course he might, without harm, have added that the murderous act has to be committed willfully; but this was not necessary, since an act done deliberately, with design or premeditation, cannot possibly be understood to have been done unwillingly. 21 Cyc. 852.

That the word "willful" is not at all indispensable or necessary in the vocabulary of the law of murder superabundantly appears from the books. Nowhere has it been said to be necessary in an indictment, whereas the words "feloniously" and "of malice aforethought" have been held to be essential (21 Cyc. 851, 852; A. & E. E. of L. [1st Ed.] p. 627; Wharton, Crim. L. [7th Ed.] par. 1070; [11th Ed.] par. 650; Bouvier, L. Dict. vo. Felonious; vo. Malice Aforethought —citing 1 Chitty, Crim. Law, 242; 1 East, Pleas of the Crown, 402); and it does not enter into the definitions of murder by Coke, Blackstone, and Russell. See Bouvier, vo. Murder. Nor in the definition by Mansfield. See Bishop, New Crim. L. note, supra. Nor in the definition adopted by Cyc. vol. 21, p. 703, as being that of the common law. Nor in that of many other law books. In fact,

the word, as a rule, is not used at all in the expositions of the law of murder. While Bouvier L. Dict. says that "feloniously" and "malice aforethought" are essential in an indictment for murder, and cannot be supplied by equivalent words or circumlocutions, it does not give the word "willful" or "willfully" at all, as if not sufficiently important, or technical in character, to be entitled to a place in a law dictionary. Bishop, New Crim. L. par. 672, p. 382, says:

"*Malice Aforethought.* We saw in the historical subdivision of this chapter that by the terms of the old statutes which have separated felonious homicides into two degrees of murder and manslaughter the former are distinguished from the latter by being committed of 'malice aforethought,' or, perhaps, to speak more exactly, 'willfully and of malice aforethought.' The word 'wilfully,' however, does not appear to add anything to the meaning of the expression; while for still other reasons appearing in 'Criminal Procedure,' there is more than doubt whether it ought to have place in the definition of murder. To ascertain, therefore, whether a felonious killing is murder or manslaughter, we have simply to inquire whether it was committed of 'malice aforethought' or not."

The only reason why this or any other word could be held to be indispensable in a judge's charge to the jury would be because of some statute, or because of its aptness for conveying a meaning or idea not to be conveyed otherwise. But this word "willful," very far from being in law a word conveying a well-known definite meaning or idea, is, on the contrary, a word of most varied meaning in law. So that if it were used for explaining anything, it, in turn, would have to be explained; and the second explanation might have to be longer and more subtle than the first. In 40 Cyc. 939, we find:

"The words 'willful' and 'willfully' are of somewhat varied signification according to context in which they are used in particular cases, and the nature of the subject under discussion or treatment. They are frequently used in the sense of intentionally, or in other words as implying a purpose or design or proceeding from a conscious motion of the will as distinguished from accidentally or involuntarily, and they are accordingly used in the sense of or as

equivalent to willingly, designedly, purposely, obstinately, stubbornly, inflexibly, perversely, voluntarily, deliberately, with set purpose, being governed by the will, without regard to reason, or without yielding to reason."

In support of each of these meanings a list of decisions is cited; all these lists aggregatng perhaps 1,000 cases.

What better or more definite idea, then, would this word have conveyed to the jury than was conveyed by the words "designedly" and "deliberately," which were used by the judge, and which are said here to be its equivalents.

[9] We have in this state no common-law crimes. Nothing is a crime which is not made so by express statute. The statute making murder a crime merely names it, without further description or definition. But the word willful is added.

[10] Thus section 784, Rev. Stat.:

"Whoever shall commit the crime of willful murder, on conviction thereof, shall suffer death."

We have not lost sight of the presence of the word "willful" in this statute; we have duly considered what influence it is to be allowed to have in our law of murder, and have concluded that it can have absolutely none. The fact is, the lawmaker who here used the word would have been very much at a loss, we imagine, to explain the necessity of it. We assume it was inserted merely because the crime was so qualified in the English statute. 23 Henry VIII, c. 1, par. 3. See Bishop, New Crim. L. vol. 2, p. 353, par. 625. If that explanation will not hold, we shall have to conclude that the word was added pretty much as we add epithets which do not enlarge the meaning of words, as when we say green grass or white milk, or the poets say wet waves. For inasmuch as murder cannot be otherwise than willful, we add absolutely nothing to the meaning of the word "murder" when we qualify it by "willful." It is just as impossible for mur-

der not to be willful as for a square to be round, or a white cat to be black. Willfulness is a characteristic necessarily and absolutely inherent in murder.

The effect of the addition of a qualifier is to take the noun qualified out of the general class to which it belongs and put it in the class described by the qualifier. Thus the addition of the qualifier "white" to the noun man has the effect of taking this noun out of the general class which includes the yellow, the black, and the red man, and put it in a class including only the white man. And in like manner the effect of this qualifier willful in this statute, if the word had any meaning at all as thus used, would be to take the murder it qualifies out of the class of ordinary murders and put it in a class of murders that would be willful as contradistinguished from ordinary murders. But this cannot be, since we have in our law but one kind of murder. If this word, as we find it in this statute, had any meaning at all, it would imply that we had two kinds of murder, to wit, willful murder, and a kind not willful. Or, at any rate, it would imply that we have two kinds of murder in our law; whereas nothing is better settled than that we have but one kind. That point, as already stated, was decided once for all more than 60 years ago in the case of State v. Mullen, cited supra.

And it could not have ever been doubtful. For, as already stated, nothing is a crime in this state unless made so by express statute, and the only statutes we have on the subject of murder are sections 784, 785, and 976, Rev. Stat., and section 1048 already hereinabove transcribed, the former reading:

"Sec. 784. Whoever shall commit the crime of willful murder, on conviction thereof, shall suffer death.

"Sec. 785. There shall be no crime known under the name of murder in the second degree; but on trials for murder the jury may find the prisoner guilty of manslaughter."

"Sec. 976. All crimes, offenses and misde-

meanors shall be taken intended and construed, according to and in conformity with the common law of England; and the forms of indictment (divested, however, of unnecessary prolixity), the method of trial, the rules of evidence, and all other proceedings whatsoever, in the prosecution of crimes, offenses and misdemeanors, changing what ought to be changed, shall be according to the common law, unless otherwise provided."

In State v. Gaster, 45 La. Ann. 640, 12 South. 741, this court said:

"This section [976] is the reproduction of the thirty-third section of the act of 1805, with the simple omission of the words 'hereinbefore named,' after the words 'crimes, offenses and misdemeanors.'

"That act, which is the foundation of our penal system, fully defined as well as punished numerous offenses,' but in the case of many familiar crimes, such as murder, rape, arson, robbery, burglary, forgery and the like, it simply described them by name without further definition, and in this thirty-third section it supplied this deficiency by providing that the crimes, etc., 'hereinbefore named' shall be 'taken, intended and construed according to the common law of England,' meaning thereby to adopt the definition of the acts constituting those particular crimes which prevailed in the English law at that date."

Unless, therefore, murder in this state is the murder known at common law, the same, and identical, and no other, we are left without any definition whatever of the crime intended to be created by said section 784 under the name of murder; and as a consequence we are left, by operation of familiar principles, without any crime of murder at all in this state.

Therefore the conclusion is absolutely irresistible that there is but one kind of murder known to our law, and that it is the same, precisely and exactly the same, that was known at common law.

Now, if so, why should not the definition given of that crime by such men as Coke, Blackstone, Russell, Mansfield, Wharton, and the vast army of learned judges who in their decisions have had occasion to expound the law of murder, be accepted as sufficient? Why should a verdict be set aside in this state because of the absence from this definition of the word "willful," which all these learned men did not consider was at all necessary in it? Hence a dilemma lies squarely in the path of him who contends that in our law this word "willful" is sacramental in the definition of murder, to wit, either that our crime of murder is not the same crime of murder known at common law, or else that Coke and Blackstone and Russell and Mansfield and other luminaries of the common law were mistaken in their conception of what is a sufficient definition of that crime. We hardly think learned counsel will insist upon either of these propositions, and yet they must either do that or else accept the conclusion that the definition given by the learned trial judge, which was the accepted common-law definition, was sufficient.

[11-13] We pass to the next complaint of accused, that the learned trial judge refused to charge as to involuntary manslaughter.

There is no such crime known to our law as involuntary manslaughter. Why accused should have wanted the learned trial judge to charge as to involuntary manslaughter, a crime which does not exist in our law, is not apparent. At common law there was such a crime, punishable differently from voluntary manslaughter (13 Ruling Case L. vo. 13, p. 785); but in this state we have but one kind of manslaughter, and the question of what punishment shall be imposed for it is left entirely to the judge. If the fixing of the punishment were left to the jury, there would be some use in letting them have the views of the common law on the subject, as it might be helpful to them in arriving at a proper conclusion as to the degree of punishment. But they have nothing whatever to do with the punishment. All they have to do is to decide whether manslaughter (manslaughter of any kind, good, bad, or indifferent) has been committed. Hence they have nothing whatsoever to do with different kinds or degrees of manslaughter. And to charge them

as to something with which they thus have absolutely nothing to do can only have the effect of confusing them. For all practical purposes they might as well bring in a verdict for good, or bad, or indifferent, or meritorious manslaughter as for involuntary manslaughter. At common law there were no degrees of murder. Homicide was either plain murder or manslaughter. In most of our states, and for all we know in England by modern statute, murder is classed with degrees. But in this state we have no degrees of murder, but, as at common law, only plain murder. Now, as well might an accused require the judge to charge as to degrees of murder, because in most of the states and possibly in England to-day there are degrees of murder, as require him to charge as to degrees or kinds of manslaughter, because at common law there were, or are, degrees or kinds of manslaughter. We repeat, all that the judge is required to do in his charge is to "give to the jury a knowledge of the law." And he can do this perfectly by explaining to them what, or under what circumstances, homicide is culpable and when not, without bewildering them with any learned or antiquarian disquisitions on degrees or kinds of murder and degrees or kinds or divisions of manslaughter. They have nothing to do with all that; and their task is sufficiently bewildering already for the judge not to additionally confuse and perplex them with obsolete or irrelevant legal learning.

Early in our reports (State v. Moore, 8 Rob. 524) this court said:

"The verdict is in the following words: 'We, the jury, find the prisoner Seaborn, alias Calvin Moore, guilty of manslaughter, in the manner and form as charged in the indictment.' It is contended that it should contain a declaration that the manslaughter was either voluntary or involuntary, and that the murder should have been negatived. Whether the killing was voluntary or involuntary, if unlawful and without malice, it was equally manslaughter. The statute establishes no difference in the grades of the offense. The mode of trial, the rights of the accused, and the punishment of the offender are the same in either event. Thus there appears to us no sound reason why the jury should ascertain the particular description of manslaughter, or announce it to the court."

[14, 15] The next complaint of accused is that the judge said in his charge:

"Hence the word 'aforethought,' used in connection with the word 'malice,' in the definition of murder adds little, if anything, to the meaning of the word 'malice,' standing alone."

It is possible that in this statement the judge was not very far wrong. Bishop, New Crim. L. vol. 2, p. 386, says:

"The word 'aforethought' in the definition of murder has been held to mean almost, if not quite, nothing. There is no particular period during which it is necessary the malice should have existed, or the prisoner should have contemplated the homicide. If, for example, the intent to kill, or to do other great bodily harm, is executed the instant it springs into the mind, the offense is as truly murder as though it had dwelt there for a longer period. Still premeditation may be an element showing malice when otherwise it would not sufficiently appear."

But the word "aforethought" qualifying malice is too firmly rooted in the law of murder to be eradicated at this late day. The usage of centuries has consecrated it as the apt word for qualifying malice in the law of murder; and our judges had better conform to the usage. It is a word so technical that it cannot be left out of an indictment; and we agree with the Supreme Court of Mississippi in the following, which we excerpt from Brett v. State, 94 Miss. 669, 47 South. 781, to wit:

" 'Maliciously' and 'malice aforethought' do not mean the same thing. Malice comprehends ill will, a wickedness of disposition, cruelty, recklessness, a mind regardless of social duty, etc.; while malice aforethought, or premeditated design, has a more intense meaning. They comprehend, not only what is included within the term 'malice,' but in addition thereto mean 'premeditated malice.' "

[16] The next complaint also is well founded. The judge charged:

"But where only one of the parties enters the fight armed with a dangerous weapon, with

felonious intent to make use of the deadly weapon in the fight, and does so against his unarmed antagonist who is fighting with his fists, and kills him, the slayer is not to be heard to say the killing was manslaughter simply because it was done in the sudden heat of passion or anger. In such a case the law would infer or imply that the killing was done with malice, and the homicide would be murder and not manslaughter."

This charge was excepted to under the above-numbered bill.

The deceased was not "fighting with his fists," and the accused did not know deceased was unarmed. Under these circumstances, we agree with the following statement in the defendant's brief:

"The charge of the court, therefore, as to one entering a fight armed with a dangerous weapon, for the purpose of using it on his unarmed antagonist, if it has any application at all, would rather indicate to the jury that the judge thought that the defendant knew deceased was unarmed, when there was nothing in the record to indicate such.

"Defendant contends that a charge of this sort on an abstract proposition of law, which states hypothetical facts which do not fit the case, might easily have a prejudicial effect on the jury, and is reversible error, and asks this court to so hold, and to order a new trial for this reason."

[17] The next complaint is of the following part of the charge:

"To call a man a 'son of a bitch,' and at or near the time the opprobrious epithet is applied to him a violent blow in the face with the fists is inflicted upon him, would be an adequate cause of provocation to a person so insulted and assaulted; and, if the person so outraged should, while under the sudden heat of passion so caused, kill the other, the homicide would amount to nothing more than manslaughter."

Neither party struck at the other. There was evidence that the deceased had thrown his hand behind him, and that, on his doing so, the accused had fired the fatal shot. Under these circumstances, this illustration of a violent blow in the face was inapplicable to the case, and we agree with counsel for accused was calculated to create the impression that accused must have been violently assaulted in order to be in a position to plead self-defense.

[18] The next complaint is embodied in bills of exception 6 and 7, which are to the statement of the judge that for justifying self-defense the overt act on the part of the deceased must have amounted to a felonious assault, as follows:

"Before such a person as I have described can reasonably and honestly entertain this apprehension of danger to his life, or great bodily harm, there must be what the law calls an 'overt act, amounting to a felonious assault,' on the part of the person killed, directed against the body of the person doing the killing. The blow given in defense of the person assaulted must be struck while the danger of death or great bodily harm is either actually or apparently imminent or impending."

In the present connection we agree with what is said in the defendant's brief, as follows:

"Under the decisions it was not necessary for the overt act to amount to a felonious assault. For there to be a felonious assault, the person perpetrating it must have intended a felony, while it is the law that he may have intended no harm at all. It is not what the person assaulting, or apparently assaulting, intends that controls, but what the act he does, taken in consideration with facts which had preceded, caused the defendant to believe deceased intended, and which gave him the right to so believe, that controls. It might well be that deceased committed no assault at all, and that he did not intend to commit any, and yet such facts could exist as would give defendant the right to have taken his life.

"In the case of the State v. Rideau, 116 La. 247, 40 South. 691, an uncle had threatened the life of his nephew the day before. The next morning he entered the bedroom of his nephew, who, without a word, shot him as he entered. Defendant offered to prove the desperate character of his uncle and previous threats, but these were excluded on the ground that there was no overt act. This court said entering another man's sleeping room may be a friendly or a deadly act according to circumstances.

"Referring to his entering the room the court said, 'We think it was a hostile demonstration.' Deceased had a trunk in the room, and it could have been that he was entering to get something out of the trunk. But the intention of the deceased is not the test. The test is what the defendant believed, and what the act of deceased gave him to believe."

The other bills were reserved to the refusal of the judge to give certain special charges, which the judge says he declined to give because already covered in the general

charge, and to certain remarks of the district attorney in his argument to the jury. The remarks were merely argumentative we think; and, as they related to the other accused who was acquitted and is not to be tried again, they need not be noticed further. The other special charges bear upon a point as to which there is no difference of opinion between the judge and counsel. The judge evidently understands the law fully on this point, and is willing to expound it correctly. All that need be said here, therefore, is that perhaps it might be well for him to be more explicit next time, if for no other reason than to forestall objection, and all the incidental trouble.

The judgment and verdict herein are therefore set aside, and the case is remanded to be proceeded with according to law.

See dissenting opinion of LECHE, J., in which MONROE, C. J., concurs, 78 South. 940.